Filed 3/2/23 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| COMMITTEE TO RELOCATE MARILYN,<br><br>　　　Plaintiff and Appellant,<br><br>　　　v.<br><br>CITY OF PALM SPRINGS,<br><br>　　　Defendant and Respondent;<br><br>PS RESORTS,<br><br>　　　Real Party in Interest and Respondent. | D080907<br><br><br>(Super. Ct. No. CVRI2101435)<br><br>ORDER MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on February 23, 2023, be modified as follows:

On page 32, second sentence of the first paragraph, the word "not" is inserted to now read as follows:

> The City demurred, arguing the statutory provisions concerning street vacation were not applicable because the City did not ultimately seek to vacate the public's vehicular access rights to Museum Way.

> There is no change in judgment.

McCONNELL, P. J.

Copies to:  All parties

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| COMMITTEE TO RELOCATE MARILYN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF PALM SPRINGS,<br><br>    Defendant and Respondent;<br><br>PS RESORTS,<br><br>    Real Party in Interest and Respondent. | D080907<br><br><br>(Super. Ct. No. CVRI2101435) |


APPEAL from a judgment of the Superior Court of Riverside, Ronald Johnson, Judge.  Reversed and remanded with instructions.

Chatten-Brown, Carstens & Minteer, Amy C. Minteer, Michelle N. Black, and Sunjana Supekar for Plaintiff and Appellant.

Best Best & Krieger, Richard T. Egger, Amy E. Hoyt, and Avi Rutschman for Defendant and Respondent.

Blasdel Guinan Lawyers and Diane C. Blasdel for Real Party in Interest and Respondent.

# I

# INTRODUCTION

The City of Palm Springs closed off one of its downtown streets to all vehicular traffic for a period of three years to allow a Palm Springs tourism organization to install and display a large statue of Marilyn Monroe in the middle of the street.

A citizens' group called the Committee to Relocate Marilyn (hereafter, the Committee) filed a petition for writ of administrative mandate challenging the street closure. It alleged the City did not have the statutory authority to close the street under Vehicle Code section 21101, subdivision (e), which permits cities to "[t]emporarily clos[e] a portion of any street for celebrations, parades, local special events, and other purposes" for the safety and protection of persons who use the street during the temporary closure. In the Committee's view, the street closure was impermissible because it was long-term—not temporary. Additionally, the Committee alleged the City erroneously declared the street closure categorically exempt from environmental review under the California Environmental Quality Act (CEQA) (Pub. Resources Code, §§ 21000 et seq.).

The City demurred to the petition for writ of administrative mandate, arguing it had the authority to close the street for three years under Vehicle Code section 21101, subdivision (e), and its local equivalent, Palm Springs Municipal Code section 12.80.010. The City claimed the street closure was temporary, and therefore permissible, because it was not permanent. Further, the City argued the CEQA cause of action was untimely because the City filed a notice of exemption stating the project was categorically exempt from environmental review, thus triggering a 35-day statute of limitations for the filing of any legal challenge to the exemption finding (Pub. Resources

2

Code, § 21167, subd. (d)). According to the City, the Committee did not assert its CEQA claim until after the expiration of the 35-day statute of limitations period. The trial court sustained the demurrer without leave to amend and entered a judgment of dismissal in favor of the City.

Contrary to the trial court, we conclude the Committee pleaded allegations sufficient to establish that the City exceeded its authority under Vehicle Code section 21101, subdivision (e), and Palm Springs Municipal Code section 12.80.010. These enactments allow cities to temporarily close portions of streets for short-term events like holiday parades, neighborhood street fairs, and block parties—proceedings that generally last for hours, days, or perhaps as long as a few weeks. They do not vest cities with the expansive power to close public streets—for years on end—so statues or other semi-permanent works of art may be erected in the middle of those streets.

We also conclude the Committee pleaded allegations sufficient to establish the timeliness of its CEQA cause of action. As noted, the City filed a notice of exemption declaring the project categorically exempt from environmental review. However, the notice of exemption stated the public's vehicular access to the downtown street would be vacated as part of the project. But, after the notice of exemption was filed, the City abandoned its plan to vacate vehicular access to the street and elected to close the street instead. Because the City materially changed the project after it filed its notice of exemption, and it did not afford the public an opportunity to consider the revised project or its environmental effects, the notice of exemption did not trigger a 35-day statute of limitations. Instead, the CEQA cause of action was subject to a default statute of limitations of 180 days, measured from the date the Committee knew or should have known about the changed project. Based on our review of the operative pleading, the

3

Committee timely filed its CEQA cause of action within the applicable 180-day statute of limitations period.

In light of these conclusions, we reverse the judgment of dismissal, vacate the demurrer ruling as to the Vehicle Code, Palm Springs Municipal Code, and CEQA causes of action, and instruct the trial court to enter a new order overruling the demurrer as to these three causes of action.

## II

## BACKGROUND

A. *Factual Background*

This appeal arises from a judgment entered after the sustaining of a demurrer without leave to amend. Therefore, the following background section is taken from the allegations of the operative first amended petition for writ of administrative mandate and other matters properly subject to judicial notice. (*Dudek v. Dudek* (2019) 34 Cal.App.5th 154, 160, fn. 4.)

Forever Marilyn is a 26-foot-tall, 34,000-pound statue of the actress Marilyn Monroe, made out of painted aluminum and stainless steel. It portrays Monroe in a famous scene from the 1955 film, "The Seven Year Itch," in which Monroe's white dress is lifted up by a gust of wind from a New York City subway grate. A photograph of Forever Marilyn is set forth as Figure 1 at the end of this judicial opinion.

In May 2012, Forever Marilyn was acquired by PS Resorts, a nonprofit organization that promotes tourism in Palm Springs, where the actress Monroe was reportedly first discovered in 1949. PS Resorts displayed Forever Marilyn to the public on an empty lot in downtown Palm Springs until May 2014. Thereafter, Forever Marilyn was displayed at various other sites in the United States and abroad.

4

In 2016, the Palm Springs City Council approved a plan to install Forever Marilyn in a new public park in downtown Palm Springs.  The park is shaped like a horizontal rectangle and it is bordered to the west by Museum Drive, to the south by Museum Way, and to the east by Belardo Way.  The Palm Springs Art Museum is located on the western side of Museum Drive at the intersection of Museum Drive and Museum Way.

In October 2020, PS Resorts requested approval from the City Council and other public officials to place Forever Marilyn directly on Museum Way between Museum Drive and Belardo Way, rather than placing it in the park.  PS Resorts' proposal would transform Museum Way into a vehicle-free, pedestrian-only "art walk" leading from the intersection of Museum Way and Belardo Way to the entrance of the Palm Springs Art Museum.  PS Resorts believed Museum Way was a desirable site for Forever Marilyn because it would provide the statue with a picturesque mountain backdrop and visibility from a major downtown thoroughfare.

City officials prepared a staff report endorsing PS Resorts' request.  The staff report agreed with PS Resorts that Forever Marilyn would have a scenic backdrop and high visibility if it were placed on Museum Way.  Further, it noted that pre-installed bollards could be deployed on either end of Museum Way to restrict vehicle access to the street and ensure the safety of pedestrians who would queue up to view or photograph the statue.  The staff report considered alternative locations for Forever Marilyn, including the downtown park, but found them unsatisfactory for site-specific reasons.  The staff report acknowledged the placement of the statue on Museum Way could be considered a project for purposes of CEQA.  However, it stated that City staff determined the placement was categorically exempt from

environmental review under CEQA's "Class 1" exemption for existing facilities (Guidelines,[1] § 15301).

Members of the public submitted dozens of written comments both supporting and opposing the statue's proposed placement on Museum Way. Several persons who opposed the placement on Museum Way specifically disagreed with the plan to close the street to vehicular traffic. Some members of the public predicted the street closure would contribute to greater traffic congestion in the downtown area.

The City Council considered PS Resorts' proposal at a regular meeting on November 12, 2020. By consensus, the City Council accepted the staff report's recommendations. The minutes from the regular meeting state that the City Council "provided direction to the City Manager as follows:

"a. Placement of the Forever Marilyn sculpture created by the artist Seward Johnson within Museum Way between Museum Drive and Belardo Road adjacent to the Downtown Park.

"b. Authorization for the City Manager to execute a three-year License Agreement with PS Resorts in a form approved by the City Attorney authorizing the placement of the Forever Marilyn sculpture within Museum Way, with direction to include a termination clause with sufficient notice to relocate the sculpture and periodic updates to the City Council regarding impacts to the Palm Springs Art museum and surrounding area.

---

[1]     " 'Guidelines' refers to the administrative regulations implementing CEQA found in title 14, section 15000 et seq., of the California Code of Regulations, as authorized by Public Resources Code section 21083. The Secretary of the Natural Resources Agency is responsible for adopting guidelines and amendments thereto, based on recommendations from the Office of Planning and Research." (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 838, fn. 3.)

6

"c.  *Authorization for the City Engineer to proceed with the process of vacating the public's vehicular access rights* on a portion of Museum Way between Museum Drive and Belardo Road."  (Italics added.)

Soon after the City Council meeting, the City and PS Resorts executed a three-year license agreement, effective December 2, 2020, permitting PS Resorts to install and display Forever Marilyn on Museum Way between Museum Drive and Belardo Way.  The City has a contractual right to terminate the agreement with cause in the event of an uncured breach, as well as a contractual right to terminate the agreement for any reason with a 365-day notice to PS Resorts.  The agreement requires PS Resorts to remove the statue and restore the licensed area to its original condition upon the termination or expiration of the agreement.  However, it states the license may be extended beyond the original three-year term.

On December 29, 2020, the City filed with the county clerk a notice of exemption, indicating the project was categorically exempt from CEQA under the "existing facilities" exemption.  It identified PS Resorts as the project applicant and listed the project location as, "On Museum Way, between Belardo Road and Museum Drive."  It stated, "[t]he project consists of the placement of the 'Forever Marilyn' statue, which is a 26-foot tall sculpture, within an existing street, which requires the City to enter into a License Agreement with P.S. Resorts to authorize the placement [sic] the statue *and vacate the public's vehicular access rights on a portion of Museum Way*." (Italics added.)  Further, it stated the project was exempt for the following reasons:  "In accordance with Section 15301 of the CEQA Guidelines, on 11/12/2020 the City Council deemed the project exempt as a Class 1 project consisting of the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public structures, involving

7

negligible or no expansion of use beyond that existing at the time of the lead agency's determination."

On January 27, 2021, the Committee sent a letter to the City Manager requesting clarification on whether the City still intended to close vehicular access to Museum Way through a street vacation process. Nearly a month later, on February 24, 2021, the City Attorney responded with a letter stating the City planned to temporarily restrict vehicular access to Museum Way, rather than vacating the street. He stated the City opted not to vacate the street because it was unlikely the City could meet the statutory requirements necessary to do so.

On March 22, 2021, the City's Development Services Director issued a determination authorizing the temporary closure of Museum Way to vehicular traffic under Vehicle Code section 21101, subdivision (e), and Palm Springs Municipal Code section 12.80.010. It approved the closure of Museum Way "for no longer than the period for which the placement of Forever Marilyn is authorized pursuant to the temporary license agreement entered into between the City of Palm Springs and PS Resorts."[2]

B. *Procedural Background*

On March 19, 2021 (three days before the temporary street closure determination), the Committee filed a petition for writ of administrative mandate naming the City as respondent and PS Resorts as real party in interest. It requested a peremptory writ of mandate requiring the City to void its approval of Museum Way's closure to vehicular traffic and an injunction prohibiting the City from taking any further action to install

---

[2]    The Committee filed an administrative appeal from the Development Services Director's determination. However, the City rejected the appeal, reasoning that CEQA, the Public Resources Code, and the Municipal Code did not authorize the appeal.

Forever Marilyn. It challenged the installation of Forever Marilyn on several grounds, but it did not assert a CEQA cause of action.

Thereafter, the Committee applied for a temporary restraining order to enjoin the City from taking any additional actions to install Forever Marilyn. The trial court initially issued the temporary restraining order and ordered the City to show cause why a preliminary injunction should not be issued. However, after the submission of further briefing, the court denied the preliminary injunction and dissolved the temporary restraining order, thus allowing the installation of Forever Marilyn to proceed. Museum Way was ultimately closed off to vehicular traffic and Forever Marilyn was installed on Museum Way, though it is not apparent from the appellate record exactly when these events occurred.

On April 22, 2021, the Committee filed the operative first amended petition for writ of mandate. The petition alleged the three-year closure of Museum Way violated Vehicle Code section 21101, subdivision (e), and Palm Springs Municipal Code section 12.80.010, both of which permit local authorities to close portions of streets temporarily and for specified purposes. It alleged the City violated CEQA because the installation of Forever Marilyn and the closure of Museum Way could have adverse environmental impacts on traffic, aesthetics, and historical resources, yet the City did not conduct an environmental review for the project.[3] Further, it alleged causes of actions for declaratory relief, violations of the Government Code, and violations of the street vacation provisions of the Streets and Highway Code.

---

[3]    According to the operative petition for writ of mandate, the Palm Springs Art Museum was listed on the National Register of Historic Places and designated by the City as a Class 1 historic site.

9

The City demurred to the Vehicle Code, Palm Springs Municipal Code, CEQA, and Streets and Highway Code causes of action. The City argued the Vehicle Code and Municipal Code causes of action failed to state a claim because the closure of Museum Way was not permanent and the street was closed for a permissible purpose. It claimed the CEQA cause of action was untimely because it was not asserted within 35 days of December 29, 2020, when the City filed its notice of exemption. And it contended the Streets and Highway Code cause of action failed because street vacation procedures do not apply to temporary street closures (like the closure of Museum Way).

The Committee opposed the City's demurrer. It argued the demurrer to the Vehicle Code and Palm Springs Municipal Code causes of action should be overruled because the closure of Museum Way was long-term—not temporary—and the installation of Forever Marilyn was inconsistent with the types of statutorily-enumerated events warranting a temporary street closure. The Committee asserted its CEQA claim was timely because the City changed the scope of the project after it filed the notice of exemption. According to the Committee, the City changed the project because it ultimately authorized a temporary street closure instead of a street vacation. Because the project changed, the Committee asserted that a default 180-day statute of limitations applied and began running on March 22, 2021, when the City first authorized the temporary street closure. The Committee asserted its CEQA cause of action was timely because it was filed within the 180-day period statute of limitations. As for the Streets and Highway cause of action, the Committee repeated its contention that the City failed to comply with the requirements necessary for street vacation.

The trial court sustained the demurrer without leave to amend. Thereafter, the Committee requested dismissal of its still-pending

10

declaratory relief and Government Code causes of action, and the trial court entered a judgment of dismissal for the City.

## III

## DISCUSSION

A. *Standard of Review*

" 'In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory.' [Citation.] ' "We treat the demurrer as admitting all material facts properly pleaded." ' [Citation.] We 'accept as true not only those facts alleged in the complaint but also facts that may be implied or inferred from those expressly alleged.' [Citation.] 'We do not, however, assume the truth of contentions, deductions, or conclusions of fact or law.' " (*Munoz v. Patel* (2022) 81 Cal.App.5th 761, 771 (*Munoz*).) " ' " "[A] demurrer based on an affirmative defense will be sustained only where the face of the complaint discloses that the action is necessarily barred by the defense.' " ' " (*Silva v. Langford* (2022) 79 Cal.App.5th 710, 716.)

" 'In considering a trial court's order sustaining a demurrer without leave to amend, " 'we review the trial court's result for error, and not its legal reasoning.' " ' [Citation.] We ' "affirm the judgment if it is correct on any theory." ' [Citation.] 'And when [a demurrer] is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.' [Citation.] 'The burden of proving such reasonable possibility is squarely on the plaintiff.' " (*Munoz, supra*, 81 Cal.App.5th at p. 771.)

11

B. *The Trial Court Erred in Sustaining the Demurrer to the Vehicle Code and the Palm Springs Municipal Code Causes of Action*

This appeal requires us to decide whether the City acted in excess of its authority under the Vehicle Code and the Palm Springs Municipal Code when, as alleged by the Committee, it closed off one of its public streets to vehicular traffic for three years to allow for the installation and exhibition of Forever Marilyn in the street. Accepting the Committee's allegations as true for purposes of this appeal, we conclude the City exceeded its authority.

1. *Statutory Framework*

" The streets of a city belong to the people of the state, and every citizen of the state has a right to the use thereof, subject to legislative control .... The right of control over street traffic is an exercise of a part of the sovereign power of the state ....' " (*Rumford v. City of Berkeley* (1982) 31 Cal.3d 545, 549 (*Rumford*).) " ' " 'Streets and highways are established and maintained primarily for purposes of travel and transportation by the public, and uses incidental thereto.' " ' " (*Citizens Against Gated Enclaves v. Whitley Heights Civic Assn.* (1994) 23 Cal.App.4th 812, 819.) " ' "The use of highways for purposes of travel and transportation is not a mere privilege, but a common and fundamental right, of which the public and individuals cannot rightfully be deprived ... [All] persons have an equal right to use them for purposes of travel by proper means, and with due regard for the corresponding rights of others." ' " (*Rumford*, at p. 550, italics omitted.)

Vehicle Code section 21 embodies the state's preemption over the field of traffic control. It states, "Except as otherwise expressly provided, the provisions of this code are applicable and uniform throughout the state and in all counties and municipalities therein, and a local authority shall not enact or enforce any ordinance or resolution on the matters covered by this code … unless expressly authorized by this code." (Veh. Code, § 21, subd. (a).)

12

"Thus, unless 'expressly provided' by the Legislature, a city has no authority over vehicular traffic control." (*Rumford, supra*, 31 Cal.3d at p. 550; see *Save the Sunset Strip Coalition v. City of West Hollywood* (2001) 87 Cal.App.4th 1172, 1177–1178 ["A city has no authority over vehicular traffic control except as expressly provided by the Legislature."].) "The delegation of power to local authorities to enact traffic regulations applicable within their jurisdictions is strictly construed." (*City of Poway v. City of San Diego* (1991) 229 Cal.App.3d 847, 858; see *Save the Sunset Strip Coalition*, at p. 1178 ["Statutory authority to prescribe traffic rules is strictly construed."].)

The Legislature delegated some of the state's plenary power over traffic control to local authorities in Chapter 1, Article 3 of the Vehicle Code (sections 21100–21118). Pertinent here, Vehicle Code section 21101, subdivision (e), provides: "Local authorities, for those highways under their jurisdiction, may adopt rules and regulations by ordinance or resolution … on the following matters: [¶] ... [¶] (e) Temporarily closing a portion of any street for celebrations, parades, local special events, and other purposes when, in the opinion of local authorities having jurisdiction or a public officer or employee that the local authority designates by resolution, the closing is necessary for the safety and protection of persons who are to use that portion of the street during the temporary closing."[4]

Palm Springs Municipal Code section 12.80.010 largely mirrors this provision of the Vehicle Code. In relevant part, it states: "The director of community development for the city of Palm Springs may close a portion of any highway, street or public way for celebrations, parades, local special events, and other purposes when, in the opinion of such director, the closing

---

4    The Vehicle Code uses the terms "street" and "highway" synonymously. (Veh. Code, §§ 360, 590; see *Rumford, supra*, 31 Cal.3d at p. 550, fn. 5.)

13

is necessary for the safety and protection of persons who are to use that portion of the highway, street or public way during the closing." (Palm Springs Mun. Code, § 12.80.010, subd. (a).) For purposes of this appeal, we apply the same analysis to both the Vehicle Code and the Palm Springs Municipal Code causes of action, as the parties have done when discussing these causes of action in their appellate briefs.

2. *Scope of Vehicle Code section 21101, subdivision (e)*

Against this statutory landscape, we turn to whether Vehicle Code section 21101, subdivision (e), permitted the City to close Museum Way for three years to allow for the installation and display of Forever Marilyn. This requires us to undertake a statutory interpretation analysis.

" 'When we interpret a statute, "[o]ur fundamental task ... is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.] "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' " (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616–617.)

14

We begin by examining the language of Vehicle Code section 21101, subdivision (e).  It allows local authorities to "[t]emporarily" close portions of streets "for celebrations, parades, local special events, and other purposes," where necessary to protect and safeguard persons who are using the street during the temporary street closure.  (Veh. Code, § 21101, subd. (e).)  One of the central disputed issues in this appeal is the meaning of the word, "temporarily."  The Vehicle Code does not define, "temporarily."  Therefore, we must deploy means other than a legislative definition to discern the Legislature's intent when it used the word, "temporarily," in this provision.

The City argues "temporary" means that something lasts for a limited time—regardless of how long that time may be.  In other words, the City claims "temporarily" is an antonym of "permanently."  To support this argument, the City cites dictionary definitions of the words "temporary" and "temporarily," which we may properly consider when analyzing the meaning of the statute.  (*Dept. of Finance v. Commission on State Mandates* (2022) 85 Cal.App.5th 535, 567 ["We may look to dictionary definitions to determine the usual and ordinary meaning of a statutory term."].)  One especially relevant dictionary definition, which we uncovered in our own independent research, defines "temporarily" as, "For a time (only); during a limited time."  (Oxford English Dict. (1933 supp.) p. 169, col. 1.)[5]  Applying its understanding of "temporary" to the statute, the City argues it closed Museum Way

---

[5]    The parties cite modern dictionary definitions of "temporary" and "temporarily."  Although such definitions may aid in discerning legislative intent, we believe the more helpful dictionary definitions are those in existence at or about the time the legislation in question was enacted.  (See *Kouichi Taniguchi v. Kan Pacific Saipan, Ltd.* (2012) 566 U.S. 560, 566–568.) Vehicle Code section 21101, subdivision (e), was enacted in its original form in 1965.  (Stats. 1965, ch. 764, § 1.)  Thus, we discuss the dictionary definitions of "temporarily" that were in effect at or shortly after 1965.

temporarily because the closure was limited to the term of the license agreement, which is three years.

The Committee defines the word "temporarily" differently. It claims "temporarily" refers to something that lasts for a relatively short period of time. Several dictionary definitions of the word, "temporarily," bolster this argument. (See Webster's 3d New Internat. Dict. (3d ed. 1968) p. 2353, col. 3 [defining "temporarily" as, "for a brief period: during a limited time: briefly"]; see also Black's Law Dict. (4th ed. 1968) p. 1634, col. 1 ["temporarily" means, "Lasting for a time only, existing or continuing for a limited time, *not of long duration*, not permanent, transitory, changing, *but a short time*."], italics added.) In the Committee's view, the City did not close Museum Way temporarily because, as all parties seemingly agree, three years is not a relatively short period of time for the closure of a public street.

Standing in isolation, the word, "temporarily," is reasonably susceptible to both parties' interpretations. Indeed, the Supreme Court has opined that, "temporary" (the adjective form of the adverb, "temporarily"), "is a word of much elasticity and considerable indefiniteness. [Citation.] It has no fixed meaning in the sense that it designates any fixed period of time." (*State Farm Mut. Auto. Ins. Co. v. Johnston* (1973) 9 Cal.3d 270, 273.) We agree. Thus, we decline to draw any conclusions about the Legislature's intended meaning based exclusively on its use of the word, "temporarily."

However, the statutory language *following* the word, "temporarily," in Vehicle Code, section 21101, subdivision (e), provides us with the context necessary to determine which party's understanding is correct. As noted above, " ' " 'we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the

16

legislative purpose.' " ' " (*Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 673; see *Kaanaana v. Barrett Bus. Servs., Inc.* (2021) 11 Cal.5th 158, 169 ["words used in a statute are considered in context, not isolation"].)

Vehicle Code section 21101, subdivision (e), grants local authorities the power to "temporarily" close portions of streets, but only for limited reasons—for "celebrations, parades, local special events, and other purposes," where the closure is necessary to safeguard and protect persons using the street. All of the proceedings warranting a temporary street closure share a common characteristic. In all or nearly all circumstances, they take place over the course of a few hours, days, or perhaps weeks. In the common and ordinary sense, none of these proceedings are significantly protracted in duration, and certainly none of them last for three or more years. Given that the word, "temporarily," precedes a list of short-term events that are always relatively brief in duration, the most natural construction of "temporarily" is that it likewise indicates the street closures must be brief in duration.

The City disagrees, noting that the statute allows local authorities to temporarily close portions of streets for "other purposes," a catch-all phrase the City reads expansively to encompass both long- and short-term events. We reject the City's broad construction of the statutory phrase, "other purposes." "Under the maxim *ejusdem generis* (of the same kind), 'if a statute contains a list of specified items followed by more general words, the general words are limited to those items that are similar to those specifically listed.' " (*Rincon Band of Luiseño Mission Indians, etc. v. Flynt* (2021) 70 Cal.App.5th 1059, 1091–1092; see *J. Arthur Properties, II, LLC v. City of San Jose* (2018) 21 Cal.App.5th 480, 486 [" 'when a particular class of things modifies general words, those general words are construed as applying only to things of the same nature or class as those enumerated' "].) Applying that cannon of

17

construction here, the general phrase, "other purposes," must be limited by the specific list of events preceding it. As just discussed, all of these proceedings are widely understood to be short-term in nature.

The City also argues the Legislature sanctioned long-term street closures because it did not impose concrete time limitations in the statute itself. The City claims the statute could have been written to state, for example, that local authorities may temporarily close portions of streets for periods of time not to exceed one year (or some other amount of time). The City's argument is unconvincing. The mere fact the Legislature declined to impose a definite time limitation for temporary street closures does not logically suggest the duration of a given street closure was irrelevant to the Legislature. It simply indicates the Legislature did not desire to impose on local authorities a rigid and unyielding time limitation that would apply in all circumstances. Instead, it used the word "temporarily" to limit street closures to those lasting for a relatively brief period of time, depending on the underlying need for, and purpose of, the street closure at issue.

The Committee's construction of Vehicle Code section 21101, subdivision (e), which we adopt as our own, is also the only one that is consistent with the law's broader statutory scheme. As we have discussed, the state has plenary power over traffic control and any delegation of such authority must be expressly provided. (Veh. Code, § 21; *Rumford, supra*, 31 Cal.3d at pp. 549–550.) Therefore, " ' "if there is a doubt as to whether or not [a traffic] regulation is a municipal affair, that doubt must be resolved in favor of the legislative authority of the state." ' " (*Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1183.) The Committee's interpretation of Vehicle Code section 21101, subdivision (e), adheres to these

18

principles by limiting the power delegated from the state to local authorities. The City's interpretation turns these principles on their head.

Moreover, we must "avoid a construction that would lead to unreasonable, impractical, or arbitrary results.' " (*Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1385.)  The City's understanding of Vehicle Code section 21101, subdivision (e), threatens to produce such a result.  Under the City's expansive reading of the statute, a local authority could close a portion of a public street for any length of time, so long as the street closure ends *at some time* in the future.  And it could do so for virtually any purpose (recall, the City urges a broad reading of the statutory phrase, "other purposes"), so long as the street closure is necessary to protect and safeguard persons who are using the street during the street closure.  We do not believe the Legislature intended to delegate such a vast expansion of power to local authorities when it granted them the right to "temporarily" close portions of streets for celebrations, parades, local special events, and the like.

For all these reasons, we conclude the most reasonable construction of Vehicle Code section 21101, subdivision (e), is that it permits local authorities to close portions of streets only for a relatively short period of time, assuming there has been a determination that the closure is necessary to safeguard and protect persons using the street during the temporary closing.  It does not authorize local authorities to close streets to vehicular traffic for whatever non-permanent duration of time they desire.[6]

---

[6]    We have reviewed the legislative history of the 1965 bill that amended Vehicle Code section 21101 to add the provision that is now subdivision (e). (Assem. Bill No. 1401 (1965 Reg. Sess.) § 1.)  It is sparse and does not clarify the legislative intent behind the statutory provision at issue.

19

3. *The City Exceeded its Authority under the Vehicle Code and the Palm Springs Municipal Code*

The Committee has alleged facts sufficient to establish that the City exceeded its authority under Vehicle Code section 21101, subdivision (e), and its Palm Springs Municipal Code analogue. According to the operative petition for writ of administrative mandate, as well as documents subject to judicial notice, the City approved the closure of Museum Way for three years for the implementation and display of Forever Marilyn. The three-year closure of Museum Way is not a relatively short-term street closure. Indeed, the City does not argue otherwise. Because the City authorized a prolonged closure of a public street to vehicle traffic—not a temporary closure—it

---

Nonetheless, the Committee has requested judicial notice of several documents relating to the legislative history of the bill. We grant the request for the following documents: (1) different versions of the bill as it made its way through the Legislature; (2) the procedural history of the bill from the Assembly Final History; (3) excerpts from the Legislative Digest; (4) excerpts from the Senate and Assembly Journals; and (5) the Enrolled Bill Report. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 31–35 (*Kaufman*).) We deny the request for the following documents: (1) a post-enrollment letter from the bill's author to the Governor, as there is no indication the letter was sent to other legislators; (2) post-enrollment letters from interested parties to the Governor urging him to sign the bill; (3) a biography of the bill's author; and (4) a newspaper article discussing the signing of the bill. (*Id.* at pp. 37–38.)

Additionally, the Committee requested judicial notice of documents relating to the legislative history of the 1998 bill that amended Vehicle Code section 21101, subdivision (e), to ensure a single public officer or employee may determine a temporary street closure is necessary (Sen. Bill No. 1649 (1997–1998 Reg. Sess.) § 24). This legislative history is similarly ambiguous and unhelpful in discerning legislative intent. Still, we grant the request for the following documents pertaining to this bill: (1) the chaptered bill; (2) a bill report from the Assembly Committee on Local Government; (3) a staff memorandum from the Senate Committee on Land Use; (4) a resolution from the Kern County Board of Supervisors proposing the bill; and (5) the Enrolled Bill Report. (*Kaufman, supra*, 133 Cal.App.4th at pp. 32–33, 37.)

exceeded its authority under state and local law. Therefore, the trial court erred insofar as it sustained the demurrer to the Vehicle Code cause of action (claim 1) and the Palm Springs Municipal Code cause of action (claim 3).

## C. *The Trial Court Erred in Sustaining the Demurrer to the CEQA Cause of Action*

The Committee alleged the City violated CEQA by approving the closure of Museum Way to vehicular traffic, and the installation of Forever Marilyn, without conducting an environmental review for the project. According to the Committee, the project warranted such review because it could have adverse environmental impacts on traffic, aesthetics, and historical resources. The Committee alleged the City erred in finding the project was categorically exempt from environmental review under the existing facilities exemption because the project would significantly change the use of Museum Way and it would have significant effects on the environment due to unusual circumstances (Guidelines, § 15300.2, subd. (c)).

The City argues, as it did in the trial court, that the CEQA cause of action is time-barred. The City claims its filing of a notice of exemption triggered a shortened 35-day statute of limitations (see Pub. Resources Code, § 21167, subd. (d)), and the CEQA cause of action is untimely because it was filed after the 35-day statute of limitations period expired.

In response to this argument, the Committee contends the filing of the notice of exemption did not trigger a 35-day statute of limitations because, among other reasons, the project materially changed *after* the City filed its notice of exemption. It asserts the project changed significantly because the notice of exemption originally contemplated a street vacation for Museum Way, but the City subsequently abandoned that plan and instead closed the street pursuant to Vehicle Code section 21101, subdivision (e). Due to the

21

change, the Committee maintains that its CEQA cause of action was subject to a 180-day statute of limitations, which it satisfied. Accepting the allegations of the operative petition for writ of administrative mandate as true, we agree with the Committee.

### 1. *Statutory Framework*

"CEQA and its implementing regulations 'embody California's strong public policy of protecting the environment.' [Citation.] ' "The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] [and] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved." ' " (*Bottini v. City of San Diego* (2018) 27 Cal.App.5th 281, 291 (*Bottini*).)

In furtherance of these goals, CEQA establishes a multi-tier process of environmental review. "The first step is jurisdictional and requires a public agency to determine whether a proposed activity is a 'project.' " (*Bottini, supra*, 27 Cal.App.5th at p. 291.) Under CEQA, a " '[p]roject' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that

22

involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.) "The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Guidelines, § 15378, subd. (c).)

At the next step, "the agency must 'decide whether the project is exempt from the CEQA review process under either a statutory exemption [citation] or a categorical exemption set forth in the CEQA Guidelines [citations].'" (*Bottini, supra*, 27 Cal.App.5th at p. 292.) "'A categorical exemption is based on a finding by the Resources Agency that a class or category of projects does not have a significant effect on the environment.'" (*McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 74.) The categorical exemption of relevance in the present case is the Class 1 exemption for existing facilities, which applies to "the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use." (Guidelines, § 15301.)

"If a public agency properly finds that a project is exempt from CEQA, no further environmental review is necessary." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380; see *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 286 ["A categorically exempt project is not subject to CEQA, and no further environmental review is required."].) "Environmental review is required under CEQA only if a public agency concludes that a proposed activity is a project and does not qualify for

23

an exemption." (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1186.)

If a public agency decides a project is CEQA-exempt, it may file—but is not required to file—a notice of exemption. Any notice of exemption that is filed must be filed after the project approval, and it must include a brief description of the project, a finding the project is exempt from CEQA, and a brief statement of reasons to support the exemption finding, among other information. (Pub. Resources Code, §§ 21108, subd. (b), 21152, subd. (b); Guidelines, § 15062, subd. (a).) The notice of exemption "shall be available for public inspection" and, when the notice is filed by a local agency (as opposed to a state agency), it "shall be posted within 24 hours of receipt in the office or on the internet website of the county clerk." (Pub. Resources Code, §§ 21108, subd. (c), 21152, subd. (c); Guidelines, § 15062, subd. (c)(1)–(3).)

If the public agency does not file a notice of exemption, or if it files an invalid or premature notice of exemption, any legal challenge to the exemption finding must be filed within 180 days of project approval or, if there is no formal project approval, within 180 days from the date of commencement of the project. (Pub. Resources Code, § 21167, subd. (d); Guidelines, §§ 15062, subd. (d), 15112, subd. (c)(5).) If a valid notice of exemption is filed, the filing of the notice of exemption triggers the running of a shortened 35-day statute of limitations period for the filing of any legal challenge to the exemption finding. (Pub. Resources Code, § 21167, subd. (d); Guidelines, §§ 15062, subd. (d), 15112, subd. (c)(2).) "However, if substantial changes are made to the 'project' *after* the NOE [notice of exemption] filing or approval by the agency, a 'new' 180–day period may begin to run from the time a plaintiff knew or should have known the project substantially differed

24

from the original 'project.' " (*City of Chula Vista v. County of San Diego* (1994) 23 Cal.App.4th 1713, 1720, italics added.)

As the Guidelines themselves recognize, "CEQA provides unusually short statutes of limitations on filing court challenges to the approval of projects under the act." (Guidelines, § 15112, subd. (a).) These CEQA statutes of limitations, like statutes of limitations generally, serve "to prevent stale claims, give stability to transactions, protect settled expectations, promote diligence, encourage the prompt enforcement of substantive law, and reduce the volume of litigation." (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 499 (*Stockton Citizens*).)

Because the 35-day statute of limitations period begins running from the proper filing of a valid notice of exemption, "CEQA establishes and emphasizes public notification of an agency's action or decision as the event triggering the shortest applicable limitations periods for lawsuits alleging noncompliance with the statute." (*Stockton Citizens, supra*, 48 Cal.4th at p. 501, italics omitted.) "The reasons for this approach are clear. Public notification serves the public's right, under CEQA, to be informed of, and to have a voice in, the process of evaluating the environmental issues surrounding a contemplated action or decision." (*Id.* at p. 502.)

2. *The CEQA Cause of Action is Timely*

On November 12, 2020, the City Council authorized City officials to execute a lease with PS Resorts to install Forever Marilyn on Museum Way, and to "proceed with the process of vacating the public's vehicular access rights …." On December 29, 2020, the City filed its notice of exemption, which described the project as, "the placement of the 'Forever Marilyn' statue, which is a 26-foot tall sculpture, within an existing street, which requires the City to enter into a License Agreement with P.S. Resorts to

25

authorize the placement [sic] the statue *and vacate the public's vehicular access rights on a portion of Museum Way*." (Italics added.) But the City elected not to proceed with a vacation process. Rather, on March 22, 2021, the City's Development Services Director authorized the temporary closure of Museum Way to vehicular traffic. On April 22, 2021, The Committee filed the operative petition containing the CEQA cause of action.

The question we must decide is whether the notice of exemption triggered a shortened 35-day statute of limitations, given that the City subsequently chose not to vacate the public's vehicular access rights to the street, and instead decided to close the street to vehicles on a temporary basis. Relying on the principles discussed in *Concerned Citizens of Costa Mesa, Inc. v. 32nd District Agricultural Association* (1986) 42 Cal.3d 929 (*Concerned Citizens of Costa Mesa*) and *Ventura Foothill Neighbors v. County of Ventura* (2014) 232 Cal.App.4th 429 (*Ventura Foothill Neighbors*), the Committee argues the change to the project—implemented *after* the posting of the notice of exemption—was a substantial change that frustrated CEQA's goal of informed public participation. We agree with the Committee.

In *Concerned Citizens of Costa Mesa*, a public agency charged with the construction, maintenance, and operation of the Orange County Fairgrounds prepared an environmental impact report (EIR) to improve and upgrade the fairgrounds, including an amphitheater within the fairgrounds. (*Concerned Citizens of Costa Mesa, supra*, 42 Cal.3d at p. 933.) The EIR stated the theater would have 5,000 fixed seats, situated on six acres of land, and its stage would face away from residential areas. (*Ibid.*) Thereafter, the agency reportedly gave authority to the amphitheater builder to make changes to the project, including by increasing the number of fixed seats to 7,000, increasing the site size to ten acres, and facing the stage towards residential areas. (*Id.*

26

at pp. 933–934.)  After construction was completed, a citizens' group purportedly learned of the changes, and then filed suit against the agency and the builder for failing to prepare a subsequent or supplemental EIR for the project.  (*Ibid.*)  The defendants demurred to the complaint, arguing it was time-barred because the plaintiffs did not file suit within 180 days after construction began, which was the latest date to file a legal challenge alleging non-compliance with CEQA (see Pub. Resources Code, § 21167, subd. (a)).  (*Concerned Citizens of Costa Mesa,* at p. 934.)

The statute of limitations, applied literally, would have rendered the action time-barred.  However, the Supreme Court—accepting the allegations of the complaint as true—determined it was timely.  (*Concerned Citizens of Costa Mesa, supra*, 42 Cal.3d at pp. 937–940.)  As the Supreme Court explained, the plaintiffs alleged "they did not know of the changes made in the project … and could not with reasonable diligence have discovered them, within 180 days from the time construction of the theater commenced because the district did not make the changes public …."  (*Concerned Citizens of Costa Mesa,* at p. 937.)  The substantial project changes, and the lack of notice about those changes, "deprived plaintiffs and the public of the opportunity to participate in the evaluation of the environmental effects of the project as finally approved."  (*Id.* at p. 938.)  The Supreme Court cautioned that an agency's failure to comply with CEQA may not simply "be challenged at any time without limitation."  (*Id.* at p. 939.)  But where an agency prepares an EIR, makes substantial changes to the project, and fails to give notice about the changes, "an action challenging the agency's noncompliance with CEQA may be filed within 180 days of the time the plaintiff knew or reasonably should have known that the project under way differs substantially from the one described in the EIR."  (*Ibid.*)

27

At issue in *Ventura Foothill Neighbors* was the Ventura County Board of Supervisors' decision to construct a five-story ambulatory care clinic. In 1993, the board prepared and certified an EIR stating the building would have a maximum height of 75 feet. (*Ventura Foothill Neighbors, supra*, 232 Cal.App.4th at pp. 431–432.) In 2005, after years of delay, the board decided to relocate the building 200 feet north and 160 feet west, and to increase the building height to 90 feet. (*Ibid.*) It prepared an addendum to the EIR, which discussed the relocated site, but did not mention the height change. (*Ibid.*) It also filed a notice of determination that discussed the relocation, but not the height change. (*Ibid.*) Once construction finally got underway in 2008, a neighbor learned of the height change and, soon after, a citizens' group filed suit against the board and other public entities seeking to set aside the board's approval of the relocated building. (*Id.* at pp. 432–433.) The trial court granted a peremptory writ of mandate. (*Id.* at p. 433.)

On appeal, the board and its codefendants argued the action was untimely because the filing of the notice of determination in 2005 purportedly triggered a 30-day statute of limitations (Pub. Resources Code, § 21167, subd. (e)), and the citizens' group did not bring suit until 2008. (*Ventura Foothill Neighbors, supra*, 232 Cal.App.4th at p. 436.) Relying on *Concerned Citizens of Costa Mesa*, the Court of Appeal rejected this argument. It reasoned the "30-day statute of limitations [was] inapplicable because [the] [c]ounty did not provide notice to the public of the increase in the Clinic's height" in the notice of determination or the EIR addendum. (*Ventura Foothill Neighbors,* at p. 436.) Given the lack of notice about the changed building height, a 180-day statute of limitations applied and began running from the date the group's members were informed about the height change.

(*Ibid.*)  Because the citizens' group filed its action within the 180-day statute of limitations period, the lawsuit was timely.  (*Id.* at p. 437.)

The principles discussed in *Concerned Citizens of Costa Mesa* and *Ventura Foothill Neighbors* are controlling here.  The City's notice of exemption stated the project would "vacate the public's vehicular access rights" on Museum Way.  " 'Vacation' means the complete or partial abandonment or termination of the public right to use a street, highway, or public service easement."  (Sts. & Hy. Code, § 8309; see *id.*, § 8350 [except as otherwise provided, "the vacation of a street, highway, or public service easement extinguishes all public easements therein"].)  When a city vacates a street, " 'the beneficial use or title to the land abandoned may, and usually does, revert to private parties.' "  (*Kinney v. Overton* (2007) 153 Cal.App.4th 482, 495.)  This stands in contrast to a temporary street closure, where the public regains its right to use the street when the closure expires.  Thus, the project implemented by the City—a temporary street closure—clearly differed from the vacation contemplated by the notice of exemption.

The City contends it did not significantly change the project after it filed the notice of exemption because the notice of exemption advised the public vehicular access to Museum Way would be restricted and, according to the City, one kind of vehicular access restriction is the same as any other kind of vehicular access restriction.  This argument is unconvincing.  The types of vehicular access restrictions implicated here are materially different from one another in duration and surely could have significantly different environmental impacts.  As noted, vacation results in the abandonment or termination of the public's right to use a road, which does not result from a temporary street closure.  Thus, the public's long-term right to use the road,

29

and the environmental impacts from such use, may differ depending on which mechanism is used to restrict the public's vehicular access to the road.

The City also asserts it should be entitled to invoke the 35-day statute of limitations—even if it did change the project—because the environmental impacts from the revised project likely will be less than the environmental impacts that would have resulted from the vacation project discussed in the notice of exemption. This argument misses the mark as well. The reason we do not enforce a truncated statute of limitations when a public agency materially changes a project, and then fails to notify the public about the change, is that it "effectively deprive[s] the public of any meaningful assessment of the actual project chosen by the agency." (*Concerned Citizens of Costa Mesa, supra*, 42 Cal.3d at p. 938.) This, in turn, "compromise[s] the goal of public participation in the environmental review process." (*Ibid.*; Guidelines, § 15201 ["Public participation is an essential part of the CEQA process."].) Irrespective of whether the City believes the project it pursued will be less impactful to the environment than the one described in the notice of exemption, the City's failure to notify the public about the change effectively deprived the public of the chance to evaluate the changed project for itself and to make its own decisions as to whether to challenge the project.

Moreover, we can envision scenarios in which the project description in the notice of exemption (street vacation) could have induced members of the public to refrain from filing an expeditious legal challenge to the project— oblivious to the fact that vacation was not the project the City was actually pursuing. A street may only be vacated if the legislative body of a local agency finds, based on evidence submitted at a hearing, that the street in question "is unnecessary for present or prospective public use …." (Sts. & Hy. Code, § 8324, subd. (b).) A member of the public might sensibly decline

to pursue a costly and time-consuming legal challenge if he or she does not think the legislative body of the local agency will be able to make the findings necessary to vacate the street. Indeed, in this very case, the City ultimately declined to pursue vacation because, according to the City Attorney, the City did not believe it could make the showing necessary for vacation.

Under these circumstances, the material change to the project, made by the City *after* it filed its notice of exemption, precluded application of the 35-day statute of limitations set forth in Public Resources Code section 21167, subdivision (d). Rather, the applicable statute of limitations was 180 days, measured from the date the Committee knew or reasonably should have known the project substantially differed from the one described in the notice of exemption. (*Concerned Citizens of Costa Mesa, supra*, 42 Cal.3d at p. 939.)

The Committee asserts that date was March 22, 2021, when the City's Development Services Director authorized the temporary closure of Museum Way. We believe the correct date is a month earlier, on February 24, 2021. On that date, the City Attorney sent a letter to the Committee stating the City planned to temporarily restrict vehicular access to Museum Way, rather than vacating the street. Regardless, the CEQA cause of action (claim 6) was timely, as it was filed within 180 days of both of these dates.[7]

---

[7] Because the City changed the project after it filed the notice of exemption, it is unnecessary for us to address the Committee's alternative timeliness arguments. Those arguments include claims that: (1) the City Council did not commit the City to a definite course of action, and thus did not approve the project (Guidelines, § 15352, subd. (a)), when it authorized the City Engineer "to proceed with the process of vacating the public's vehicular access rights" on Museum Way; (2) the notice of exemption was facially invalid, and thus did not trigger the 35-day statute of limitations, because it did not include a sufficiently-detailed statement of reasons supporting the exemption finding; and (3) the City is collaterally estopped from asserting a statute of limitations defense.

D. *The Trial Court Properly Sustained the Demurrer to the Streets and Highway Code Cause of Action*

The operative petition for writ of administrative mandate alleged the City violated various provisions of the Streets and Highway Code governing street vacation. The City demurred, arguing the statutory provisions concerning street vacation were applicable because the City did not ultimately seek to vacate the public's vehicular access rights to Museum Way. The trial court sustained the demurrer to the Streets and Highway Code cause of action without leave to amend.

The Committee does not address its Streets and Highway Code cause of action, or the demurrer ruling pertaining to that cause of action, in its opening brief. We construe the Committee's failure to discuss the Streets and Highway Code cause of action as an abandonment of the claim. (See *Alborzi v. Univ. of Southern California* (2020) 55 Cal.App.5th 155, 184 ["[W]here a demurrer is sustained without leave to amend, the appellant's failure to address certain causes of action in the complaint is deemed an abandonment of those causes of action."]; *Ram v. OneWest Bank, FSB* (2015) 234 Cal.App.4th 1, 9, fn. 2 [on appeal from a judgment after an order sustaining a demurrer, unaddressed causes of action are abandoned].) Thus, we affirm the demurrer ruling as to the Streets and Highway Code cause of action (claim 2).[8]

---

[8] In its reply brief, the Committee argues, with scant analysis and no citation to relevant legal authorities, that it adequately alleged that the City violated the Streets and Highway Code. We do not consider arguments raised for the first time in a reply brief. (See *Crawley v. Alameda County Waste Management Authority* (2015) 243 Cal.App.4th 396, 403, fn. 4; *Ko v. Maxim Healthcare Servs., Inc.* (2020) 58 Cal.App.5th 1144, 1147, fn. 3.)

IV

DISPOSITION

The judgment of dismissal is reversed and the matter is remanded to the trial court with instructions: (1) to vacate its order sustaining the entire demurrer without leave to amend; and (2) to enter a new order overruling the demurrer as to the first, third, and sixth causes of action, and sustaining the demurrer without leave to amend as to the second cause of action. The Committee to Relocate Marilyn is entitled to its costs on appeal.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

DO, J.

33



*Figure 1:  Forever Marilyn*